Brian S. King, #4610
Brent J. Newton, #6950
Nediha Hadzikadunic, #15851
**BRIAN S. KING, P.C.**
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KATHLEEN T., individually and on behalf of E. T. a minor,<br><br>Plaintiffs,<br><br>vs.<br><br>CIGNA HEALTH and LIFE INSURANCE COMPANY, and the STARWOOD RETAIL PARTNERS HEALTH PLAN,<br><br>Defendants. | COMPLAINT<br><br>Case Number 2:19-cv-00859 CMR |

Plaintiff Kathleen T. ("Kathleen"), individually and on behalf of E. T. ("E.") a minor, through her undersigned counsel, complains and alleges against Defendants Cigna Health and Life Insurance Company ("Cigna") and the Starwood Retail Partners Health Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Kathleen and E. are natural persons residing in Los Angeles County, California. Kathleen is E.'s mother.

1

2. Cigna is an insurance company headquartered in Bloomfield, Connecticut and was the third-party claims administrator for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Kathleen was a participant in the Plan and E. was a beneficiary of the Plan at all relevant times.

4. E. received medical care and treatment at Summit Preparatory School ("Summit") from December 8, 2017, to August 15, 2018. Summit is a treatment facility located in Montana, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5. Cigna acting in its own capacity or through its subsidiary and affiliate Cigna Behavioral Health, denied claims for payment of E.'s medical expenses in connection with his treatment at Summit. This lawsuit is brought to obtain the Court's order requiring the Plan to reimburse Kathleen for the medical expenses she has incurred and paid for E.'s treatment.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions and because Cigna does business in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for

appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### E.'s Developmental History and Medical Background

9. Around the time that he was in fourth grade. E. began to manifest acute anxiety related to school and social issues. He was constantly getting into trouble at school and started losing a lot of his friends. E. was placed on Attention-Deficit Disorder ("ADD") medications but had violent reactions to three separate ADD medications, resulting in E.'s father having to physically restrain him and the paramedics being called on more than one occasion. E. out of control behavior often led to the need for him to be physically restrained for extended periods of time.

10. When E. was in sixth grade, his family moved to California. E. was bullied at school and had difficulty keeping up in his classes. Kathleen pulled him from school and enrolled him in online classes with a dedicated tutor after E. had a severe panic attack that caused him to miss school for a few weeks. E. continued to act out while at home however, on one occasion when he was breaking things at the house, E.'s father took him for a ride in the car in an attempt to calm him down. E. continued to act out and kicked the car windshield until it broke. E. was taken to the emergency room that night.

11. E.'s behavior at this time was so bad that Kathleen was kicked out of the townhome where she lived. E. continued to have no friends and throw violently destructive temper tantrums almost weekly, which caused him to have to be physically restrained. The

neighbors continued to complain about E.'s frequent screaming, obscenities, and property destruction. This escalated to the point that the neighbors called the police.

12. When it was time for E. to start seventh grade, Kathleen enrolled him in a new school district, but on the first day of school he became so anxious that he was unable to walk to school and had to be reenrolled in online school. This pattern continued for the next two years.

13. Around the time that E. started high school, Kathleen moved back to Indiana to help her stepfather and mother with some medical issues. E. chose to stay with his father in California and begin attending public high school. The dynamic of being away from his mother and the stress of a new school environment was very difficult for E. and he began to act out in increasingly severe ways.

14. E. was placed in therapy but refused to go following his second session. On one occasion, E.'s father had to physically restrain him for over an hour and then drove him to the emergency room when he refused to calm down, E. then continued to be physically aggressive in the car while his father was driving him to the hospital. E. stayed at the hospital overnight and his therapist recommended that Kathleen consider placing him in a wilderness or residential treatment program.

15. E. was placed on Prozac but had a similar negative reaction as he had with his ADD medications. E. was shortly afterwards taken to the hospital again after he tried to jump out of a moving car and threw his iPhone out onto the highway. The following day, E. had a complete breakdown resulting in a call to the paramedics and another admission to the emergency room. The next day, E. was sent to a wilderness program in Hawaii called Pacific Quest.

16. Kathleen hired a transport company to take E. to Pacific Quest, but he resisted, resulting in the police being called at the airport. E. eventually agreed to go to Pacific Quest if he was escorted by his mother and while he did make some gains there, he continued to struggle. E.'s treatment team recommended that he receive residential treatment following his stay at Pacific Quest.

**Summit**

17. E. was admitted to Summit on December 8, 2017, based on the recommendations of his treatment team at Pacific Quest.

18. In a letter dated July 10, 2018, Cigna denied payment for E.'s treatment at Summit, incorrectly referring to the facility as "Summit Ranch Road." The reviewer wrote in part:

   …The clinical basis for this decision is: Insufficient clinical information has been provided by the facility to support the medical necessity for admission and continued stay at the Residential Mental Health Treatment for Children and Adolescents level of care from 12/08/2017 [sic] –forward, and updated information such as: an initial assessment, M.D. orders, medications, group participation, or history of any unstable medical conditions has not been provided to explain why the current treatment could not have occurred at a less restrictive level of care. Therefore, this request is denied. …

19. On December 14, 2018, Kathleen submitted a level one appeal of the denial of payment for E.'s treatment at Summit. She pointed out that Cigna had listed treatment dates that were incorrect, stating that care was denied from December 8, 2017, to November 11, 2018, however E. was actually discharged on August 15, 2018.

20. She argued that ERISA compelled Cigna to provide her with a full, fair, and thorough review, and stated that E.'s treatment was medically necessary to treat his chronic anxiety, depression, and Oppositional Defiant Disorder. She wrote that E. had multiple instances where he had bounced between acute hospitalizations and outpatient therapy, but he failed to make progress until he started residential treatment. She argued that other

5

levels of mental health care had not treated the "root of the problem" and that residential treatment would avoid additional costly mental health treatment in the years to come.

21. She wrote that the decision to send E. to Summit was not taken lightly and was based on the recommendations of numerous medical professionals that had treated E. She included several letters of medical necessity with the appeal. Licensed psychologist Dani Levine, PhD., wrote in part in a letter dated October 15, 2018:

> …Given the persistence of [E.]'s symptoms over the years with increasing severity and escalation to suicidal ideation and self and other harm, and despite parent's attempt to treat [E.] with outpatient therapy and medication monitoring, and intensive intervention became necessary. Initially, [E.] needed a higher level of care with more staff supervision, but once he showed that he could step down, he was able to transition to a residential treatment center to achieve significant long-lasting improvements of [E.]'s condition. I consider both the shorter-term intervention at Pacific Quest and the longer-term intervention at Summit Prep to have been a medically necessary course of treatment. …

Theresa Hasting, LMHC wrote in a letter dated August 22, 2018:

> …Due to the severity of [E.]'s condition, residential treatment was necessary during his time at PQ [Pacific Quest] and after. [E.]'s mood instability led to physically acting out toward his family, restraint and hospitalization. He experienced high levels of anxiety, difficulty separating from mother, and possible sexual identity concerns. The complexities and severity of these concerns led to the need for parents to seek a residential treatment [sic] after attempts to help him through outpatient therapy and medication management proved insufficient. …
>
> In summary, residential treatment was medically necessary for [E.]'s condition. …

E.'s therapist Shauna Letvin, LCSW, wrote:

> …At the beginning of treatment [E.]'s anxiety was so severe that he was unable to get out of bed to go to school and if he managed to get to school, he was unable to focus or complete the necessary assignments and tasks. [E.]'s behavior at home was also extremely erratic where his anxiety would interfere with his basic necessity of sleep whether he was unable to get out of bed and sleep all day or he would stay up all night. Conflict with parents would also lead [E.] toward aggression where he would throw things about his room and if there were a

6

> conflict in the car he would throw objects out the window. He had a very minimal ability for managing his affect and frustration tolerance.
>
> [E.] was also very resistant to 1x week outpatient treatment and refused to come 2x week. During 1x week outpatient psychotherapy [E.] would express his debilitating anxiety and how he was unable to manage it and had little hope it would get better as he had been managing it for such a longtime. [sic] He had a hard time opening up to therapist [sic] or grasping concepts of coping skills, relaxation techniques and how his negative thoughts would affect his feeling and behaviors (CBT- Cognitive Behavioral Therapy). …
>
> After an incident with father and extreme erratic behavior, [E.] was hospitalized at Little Company of Mary. At the time, [E.]'s anxiety was at a level where he was unable to control it, medication was not stabilized and it was recommended he be in a residential therapeutic treatment setting to be able to fully address his anxiety and achieve significant and lasting improvement. …

22. Kathleen wrote that all of the medical professionals who had worked closely with E. opined that his residential treatment was medically necessary, and that the medical necessity of E.'s treatment was also reflected in his medical records. Kathleen argued that E. met the requirements for residential treatment under Cigna's medical necessity criteria.

23. Kathleen requested in the event that Cigna maintained the denial, it provide her with a copy of any administrative service agreements that existed, Cigna's clinical guidelines or medical necessity criteria, the Plan's mental health and substance use criteria, the Plan's criteria for skilled nursing, rehabilitation, and hospice facilities, and any reports from any physician or other professional regarding the claim. (collectively the "Plan Documents")

24. In a letter dated January 16, 2019, Cigna upheld the denial of payment for E.'s treatment at Summit. The reviewer gave the following justification for the denial:

> …Based upon the available clinical information received initially and with this appeal, your symptoms did not meet Cigna's Behavioral Health Medical Necessity Criteria for admission and continued stay at Residential Mental Health Treatment for Children and Adolescents level of care from 12/08/2017 – 08/15/2018. There was no current risk of harm to yourself or others. You did not demonstrate a need for 24 hour/day monitoring and active treatment. Your family was involved in treatment. From the available clinical evidence, you could receive

7

psychiatric treatment in a less restrictive setting. Appropriate lower levels of care were available for further stabilization. Therefore, the initial determination is upheld. …

25. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

26. The denial of benefits for E.'s treatment was a breach of contract and caused Kathleen to incur medical expenses that should have been paid by the Plan in an amount totaling over $61,000.

27. Cigna failed to provide Kathleen with a copy of the Plan Documents, including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of Kathleen's request.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

28. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Cigna, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

29. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

30. The denial letters produced by Cigna do little to elucidate whether Cigna conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. Cigna failed to substantively respond to the

issues presented in the Plaintiffs' appeals and did not meaningfully address the arguments or concerns that Kathleen raised during the appeals process.

31. Cigna and the agents of the Plan breached their fiduciary duties to E. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in E.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of E.'s claims.

32. The actions of Cigna and the Plan in failing to provide coverage for E.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

33. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

34. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

35. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

36. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

37. Specifically, the Plan's medical necessity criteria for intermediate level mental health treatment benefits are more stringent or restrictive than the medical necessity criteria the Plan applies to intermediate level medical or surgical benefits.

38. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for E.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does Cigna exclude or restrict coverage of medical/surgical conditions based on medical necessity, geographic location, facility type, provider specialty, or other criteria in the manner Cigna excluded coverage of treatment for E. at Summit.

39. The actions of Cigna and the Plan requiring that E. satisfy acute care medical necessity criteria in order to obtain coverage for residential treatment violates MHPAEA because the Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

40. Specifically, Cigna's reviewers utilized acute criteria such as "There was no current risk of harm to yourself or others" to evaluate the non-acute treatment that E. received. In addition, the Defendants relied on assertions such as "Your family was involved in

treatment" as a justification to deny treatment. Family involvement serves as an indicator rather than a contra-indicator of the medical necessity of treatment in a non-acute residential setting.

41. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

42. When Cigna and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. Cigna and the Plan evaluated E.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

43. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Cigna, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

44. The violations of MHPAEA by Cigna and the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan and other Cigna insured and administered plans as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

45. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for E.'s medically necessary treatment at Summit under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 1st day of November, 2019.

By    s/ Brian S. King
     Brian S. King
     Attorney for Plaintiffs

County of Plaintiffs' Residence:
Los Angeles County, California